# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VISTA MACHINING COMPANY<br>3559 Williams Rd, Suite 101<br>Fort Worth, TX 76116<br><br>and<br><br>RICHARD ROSS HYDE<br>3559 Williams Rd, Suite 101<br>Fort Worth, TX 76116,<br><br>     Plaintiffs<br><br>v.<br><br>GEN. JAMES N. MATTIS, Secretary of the<br>DEPARTMENT OF DEFENSE,<br>1000 Defense Pentagon<br>Washington, D.C. 20301,<br><br>DEFENSE LOGISTICS AGENCY<br>Andrew T. McNamara Building<br>8725 John J. Kingman Road<br>Fort Belvoir, VA 22060-6221,<br><br>LT. GEN. DARRELL K. WILLIAMS, in his official<br>capacity as Director of the DEFENSE LOGISTICS<br>AGENCY<br>Andrew T. McNamara Building<br>8725 John J. Kingman Road<br>Fort Belvoir, VA 22060-6221,<br><br>JAMES M. COYNE, in his official capacity as the<br>Defense Logistics Agency Suspension and<br>Debarment Official,<br>Andrew T. McNamara Building<br>8725 John J. Kingman Road<br>Fort Belvoir, VA 22060-6221,<br><br>MELINDA L. PERRITANO, in her official capacity<br>as the Defense Logistics Agency Special Assistant for<br>Contracting Integrity<br>Andrew T. McNamara Building | Case No.1:18-cv-1819 |

8725 John J. Kingman Road
Fort Belvoir, VA 22060-6221,

and

THE UNITED STATES OF AMERICA,

    Defendants.

---

## COMPLAINT

    Plaintiffs, Vista Machining, Inc. ("Vista") and Richard Ross Hyde ("Mr. Hyde"), by and through undersigned counsel, hereby file this Complaint against Defendant United States of America and the following individual Defendants in their official capacities: Secretary of Defense General James N. Mattis ("Secretary Mattis" or "Mattis"), Defense Logistics Agency ("DLA" or the "Agency"), DLA Director Lt. Gen. Darrell K. Williams ("Director Williams" or "Williams"), DLA Suspension and Debarment Official James M. Coyne ("SDO" or "Coyne"), and DLA Special Assistant for Contracting Integrity Melinda L. Perritano ("Perritano"). Plaintiffs refer collectively to all Defendants in this Complaint as "Defendants."

    Plaintiffs' Complaint seeks relief pursuant to the Administrative Procedure Act, 5 U.S.C. §§702-704, 706 and the Declaratory Judgment Act, 28 U.S.C. §2101-02, from DLA's May 1, 2018 Memorandum and Decision debarring Plaintiffs from federal government contracting (the "2018 Debarment Memorandum") for five years – two years longer than provided by applicable law – based on a series of arbitrary, capricious, and irrational decisions derived through a flawed

administrative proceeding that failed to provide Plaintiff's the basic due process afforded under applicable law.[1]

DLA's 2018 Debarment Memorandum constitutes final, adverse agency action that was arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, and contrary to law and regulation and fundamental fairness and good faith dealing.  Accordingly, Plaintiffs request that the Court declare the 2018 Debarment Memorandum null, void, and unenforceable, and enjoin their enforcement so as to restore Vista and Mr. Hyde's eligibility to compete and perform federal government contracts.

## I.    **PARTIES**

1.       Plaintiff, Vista Machining Company, is a corporation organized under the laws of the state of Texas with its principal place of business at 3559 Williams Rd, Suite 101, Fort Worth, TX 76116.   Vista is a Federal Government contractor registered in the Government's System for Award Management ("SAM") under Cage Code 56KU2, DUNS 08096700008.

2.       Plaintiff, Richard Ross Hyde, is a Texas resident individual with his principal place of business at 3559 Williams Rd, Suite 101, Fort Worth, TX 76116.   Mr. Hyde is a principal of Vista Machining Company.

3.       Defendant DLA is an agency within the Department of Defense and the Executive Branch of Defendant United States of America organized pursuant to 10 U.S.C. §191, with its principal place of business at 8725 John K. Kingman Road, Fort Belvoir, Virginia 22060.  The allegations set forth herein as to Defendant DLA extend to and include the employees, officers, agents, consultants and other personnel or units within DLA whose actions contributed to the agency actions complained of in this Complaint.

---

[1] Exhibit 1 attaches copies of DLA's May 1, 2018 Debarment Memorandum.  Exhibits 2a, 2b and 2c attach copies of DLA's 2017 Notice of Proposed Debarment and Memorandum.

4.      Defendant Mattis is the Secretary of the Department of Defense, of which Defendant Defense Logistics Agency is a component.  His principal place of business is 1000 Defense Pentagon, Washington, D.C. 22301. The allegations set forth herein are as to Defendant Mattis individually in his official capacity, and also extend to include the employees, officers, agents, consultants and other personnel or units within DLA whose actions within their official capacities contributed to the agency actions complained of in this Complaint.

5.      Defendant Williams is the Director of DLA, with his principal place of business at 8725 John K. Kingman Road, Fort Belvoir, Virginia 22060.  The allegations set forth herein are as to Defendant Williams individually in his official capacity, and also extend to include the employees, officers, agents, consultants and other personnel or units within DLA whose actions within their official capacities contributed to the agency actions complained of in this Complaint.

6.      Defendant Coyne is and at all relevant times was the DLA Suspension and Debarment Official ("SDO") under whose authority DLA issued the 2018 Debarment Memorandum. His principal place of business at 8725 John K. Kingman Road, Fort Belvoir, Virginia 22060.  The allegations set forth herein are as to Defendant Coyne individually, and also extend to include the employees, officers, agents, consultants and other personnel or units within DLA whose actions within their official capacities contributed to the agency actions complained of in this Complaint.

7.      Defendant Perritano is and at all relevant times was the DLA Special Assistant for Contracting Integrity who issued the 2018 Debarment Memorandum. Her principal place of business at 8725 John K. Kingman Road, Fort Belvoir, Virginia 22060.  The allegations set forth herein are as to Defendant Perritano individually, and also extend to include the employees,

officers, agents, consultants and other personnel or units within DLA whose actions within their official capacities contributed to the agency actions complained of in this Complaint.

8.      Defendant United States of America has acted through Defendants.  Defendants DLA, Mattis, Williams, Coyne, Perritano and the other officers and employees and agents to which this Complaint extends, are agents of the United States of America.

## II.      JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 1346 and 2201.  An actual and justiciable controversy exists between Plaintiffs and Defendants because Plaintiffs are seeking judicial review of, and reparation for, DLA's violations of federal laws under the Administrative Procedure Act. 5 U.S.C. §§702, 706. Plaintiffs have no other adequate remedy in any administrative or state forum and all prerequisite actions to filing this action have occurred.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b), (e) because the District of Columbia District Court is a convenient forum.  Defendant Mattis, in his official capacity as Secretary of the Department of Defense, resides in the District of Columbia.  DLA is a component of the Department of Defense and the remaining defendants are employees and agents of DLA.

## III.      INTRODUCTION

11.     This case involves DLA's nearly two-year struggle to debar Vista Machining and its principal, Richard "Ross" Hyde from Federal Government Contracting.  For over eight years – and in Hyde's case, over 50 years — Vista and Hyde have been in business supplying quality parts to DLA for applications across the nation's defense.  Since its founding in 2008, Vista has successfully filled 7,452 orders and received high praise and high quality ratings from its

customer.  Their tenure as Government contractors ended abruptly on October 7, 2016 when

DLA proposed them for debarment, citing a small handful of reasons that the Agency has yet to

prove by a preponderance of the evidence.  They have been *de facto* debarred ever since and

remain debarred to this day.

12.     Suspension and debarment of a contractor from federal procurement are serious

actions that exist solely to protect the Government from risk.  An Agency may never use

debarment as backwards-looking retaliation for past conduct.  FAR §9.402; *Silverman v. U.S.

Department of Defense*, 817 F. Supp. 846, 849 (S.D. Cal. 1993) (agency should only impose

debarment to protect the government's interest and not as consequential damages*); Lion Raisins,

Inc., v. United States*, 51 Fed. Ct. 238, 249 (2001) (agency's suspension was arbitrary and

capricious because it was based on past conduct as opposed to present responsibility).   An

Agency's debarment decision must be based on substantial, actual and specific evidence and

must follow due-process procedures set forth in the Federal Acquisition Regulation (FAR). 48

C.F.R. 9.406-3(a); *see also Int'l Exports, Inc. v. Mattis*, Civil Action No. 14-2064 (RBW) (July

17, 2017 Slip Op. at 20).  The Court must vacate debarment decisions to the extent they are

based on selective reading of the administrative record, lack complete findings of fact, lack the

requisite due process, or are otherwise arbitrary and capricious.  *Id.*

13.     The 2018 Debarment Memorandum Plaintiffs challenge in this action culminate a

prolonged and chronically flawed effort by DLA to exclude Vista and Hyde from federal

government contracting.  Undeterred by its repeated missteps, procedural abuses, and judgment

errors that have once already forced remand once, DLA continues to pursue debarment.  DLA

has faced few consequences for its outcome-driven, bull-in-a-china shop approach to debarring

Plaintiffs.  To the contrary, Vista and Mr. Hyde have remained on the Government Excluded

Parties List  since October 7, 2016.  They remain effectively debarred while DLA has attempted

to put together a viable case for debarment.

14.     This is not the first time Plaintiffs have been forced to sue Defendants in federal

court to vacate unlawful debarments.  On January 9, 2017, DLA attempted to debar Plaintiffs on

grounds nearly identical to those raised in the 2018 Debarment Memorandum at issue in this

action (the "January 2017 Debarment Notices").[2]  Plaintiffs challenged the January 2017

debarment decisions as arbitrary and capricious, irrational, and procedurally deficient.  In *Vista

Machining Company, LLC, et al. v. Defense Logistics Agency*, Civil Action No. 1:17-cv-00067

(E.D. Va. 2017) [hereinafter "Vista I"].  Exhibit 4 attaches a copy of the Vista I Complaint.

15.     In Vista I, Plaintiffs alleged that  DLA violated the APA and federal laws and

regulations governing debarment when it (among other things): (1) carelessly and haphazardly

assembled an incomplete and incomprehensible administrative record; (2) based its debarment

decisions exclusively on two documents never included in the administrative record; (3) failed to

issue a reasoned decision or any findings of fact; and (4) failed to afford Plaintiffs a factual

hearing and other required procedural due process.

16.     Before answering Plaintiff's Vista I Complaint, Defendants sought voluntary

remand. Over Plaintiff's objection, on May 3, 2017, Judge Claude M. Hilton of the United States

District Court for the Eastern District of Virginia permitted that the case be remanded to DLA

"so that Defendants can reconsider the prior decision to debar Plaintiffs from government

contract work." Exhibit 5 at p. 3.

17.     This Complaint picks up where Vista I left off.  Specifically, Plaintiffs allege that

on remand, DLA resumed its pattern of unfair proceedings and flawed, irrational decision-

---

[2] Exhibits 3a and 3b attach true and correct copies of the January 2017 Debarment Notices.

making.  As discussed below, on May 12, 2017 DLA issued new notices of proposed debarment consisting of a memorandum of conclusory, barebones assertions against Vista and Hyde.  DLA also issued another anemic and confusing administrative record that failed to show clear evidentiary connections between the documents in the record and the allegations in the memorandum.  After Vista and Hyde submitted a Presentation of Matters in Opposition on August 18 ("August 18 PMIO") that addressed and compellingly disputed every single allegation in DLA's memorandum, DLA held an informal meeting with Vista and Hyde lasting about an hour.  Seven months later, DLA debarred Vista and Mr. Hyde once again without providing a factual hearing and without issuing one written finding on a single disputed material fact (both clear requirements in the law which exist to protect contractors). Additionally, DLA's 2018 Debarment Memorandum extend Vista and Hyde's debarment from the three year maximum set forth in the FAR to five years, based (apparently) on a prior twenty-six year-old debarment action solely against Mr. Hyde – a fact that had never before been mentioned in the Agency's notice of proposed debarment, included in the administrative record, or provided Vista and Hyde an opportunity to respond.

18.     Vista and Hyde ask that this Court enter declaratory judgment that DLA actions violated the APA and federal laws and regulations governing debarment of Government contractors.  Specifically, Vista and Hyde ask that the Court find DLA violated the APA and federal law in the following ways:

    a.   DLA failed to base its decision on substantial evidence in the administrative record;

    b.   DLA failed to provide Vista and Hyde with the minimal procedural requirements required to resolve issues of material fact as required by the FAR;

    c.    DLA improperly based its 2018 Debarment Memorandum and the extraordinary decision to extend these to five-year debarments on information never-before included in the administrative record without providing Vista or Hyde any opportunity to respond; and

    d.    DLA unlawfully issued the 2018 Debarment Memorandum as a means to levy a five-year punishment for past conduct.

19.    Vista and Hyde ask that the Court vacate the 2018 Debarment Memorandum due to DLA's multiple APA violations with the effect of reinstating Vista and Hyde to continue working as Government contractors.

## IV.    STATEMENT OF FACTS

### A.    Vista/Hyde's Service Record to the Federal Government

20.    Mr. Hyde is a second-generation Government contractor with nearly 50 years of experience in supplying critical parts to DLA in support of the warfighter and the nation.  Mr. Hyde started out working in his father's machine shop at thirteen years old, packing products to Government specifications for shipment.  He graduated to the machine shop when he was 16 years old, crafting metal parts with a No. 6 Warner & Swassey turret lathe and Bridgeport milling machines.  His extensive service history includes direct supply to DoD and DLA, as well as high-caliber prime contractors such as Raytheon, SAIC and BAE systems.  Mr. Hyde formed Vista in 2008 as a parts manufacturer and supplier for Department of Defense ("DoD") customers with the goal of supplying high quality parts to DoD at a fair price.

21.    Vista has fulfilled 7,452 Government purchase orders with a less than 0.5% rejection rate.

22.    The primary allegations in DLA's Debarment 2018 Notices involve quality and quality control concerns regarding Vista Machining's processes for manufacturing, marking, and shipping goods to DLA.

23.     Since founding Vista in 2008, Mr. Hyde and Vista have filled over 7,452 POs, the vast majority of which were to DLA's complete satisfaction.  Of the 7,452 orders Vista has filled since it opened, it is aware of 166 alleged rejections – a rejection rate of approximately .022%.[3] Formerly, when DLA used a numerical quality rating system, it assigned Vista a 99.1% quality rating.[4]  After DLA switched to the color-based system, Vista received 778 "Green" ratings, 13 "Yellow" ratings, and zero failures warranting a red rating – indicating DLA found Vista's quality to be exceptional in nearly 94% of rated instances. [5]

24.     Vista's process for manufacturing and supplying parts to DLA follows a repetitive process that includes rigorous and documented quality control safeguards.  The process begins when Vista responds to DLA Requests for Quotations ("RFQ") to fill individual purchase orders ("PO") for needed parts.  By actions taken through Mr. Hyde and others, Vista uses a commercially available database to identify RFQs Vista is interested in supplying.  Based on the Government drawings and specifications, Vista submits a competitive bid, or quote, to DLA, and DLA makes an award determination.  If DLA awards the quote to Vista, Vista proceeds with manufacturing the part to the Government's specifications.

25.     Mr. Hyde is personally involved in manufacturing the parts that fill DLA's orders. At the outset of any DLA order, Mr. Hyde personally reviews the Government's PO, specifications and drawing(s) to determine what components to order from third parties, and what specific manufacturing processes the components must undergo to precisely fulfill the

---

[3] Vista describes these 166 rejections as "alleged" rejections because Vista disagrees with many of these alleged 166 rejections, including numerous rejections Vista contested in its December 19, 2016 Presentation of Matters in Opposition ("PMIO") to the Notice of Proposed Debarment ("NPD").

[4] See Exhibit 6, August 18, 2017 PMIO at Footnote 5.  In the interest of brevity, Vista submits the August 18, 2017 PMIO without its numerous and voluminous exhibits.  The exhibits will form part of the administrative record in this action.

[5] *Id.*

Government's requirements.  For example, a typical DLA order will require that Vista obtain various parts, raw materials, and vendors – like a sheet metal component, a machined component, a webbing contractor, and all existing certified hardware that will go into the end part and then apply a number of processes to it such as heat treatment, magnetic particle inspection, anodization, plating, finish application, lubrication and assembly before the final part can be shipped to DLA.

26.     Vista is a manufacturer of the parts it supplies the Government by all known and applicable definitions.  Vista's manufacturing process involves multiple steps and several levels of inspection.  Like its competitors who do similar work for DLA, Vista obtains the initial raw material to specifications and then engages several other vendors to apply the necessary processes in the appropriate sequence.  Throughout the process, Vista implements quality control procedures based on its Quality Manual to ensure that the vendors' processes are performed correctly in the proper sequence, in coordination with each other, and in accordance with Vista's and DLA's quality standards.  For more complex orders requiring assembly of several individually supplied components, Vista performs the assembly work in its shop.  Vista also is responsible for marking (*e.g.*, stamping), packaging and shipping the final product to DLA.  Of several parties that may "touch" an unfinished part during its development, only Vista executes the entire manufacturing process and only Vista is responsible for final assembly, quality assurance, government packaging and shipment to DLA.  Vista-trained employees –and Mr. Hyde himself – inspect every part it manufactures multiple times before shipping it to DLA for distribution to DLA's downstream customers.  DLA's own metric based scoring system recognized Vista's quality standards and furthermore the number of parts accepted by DLA are

evidence of Vista's quality.  Indeed, out of 7,452 orders, Vista had a less than 0.5% rejection rate.

27.     Vista employs a Quality Management System ("QMS" or "Quality Manual") to ensure that the parts it supplies DLA meet the Government's justifiably strict requirements and specifications.  Vista's ISO Tailored 9001-2008 Quality Manual ("QMS" or Quality Manual") not only incorporates ISO requirements but includes the Government's long-trusted MIL-I-45208A inspection procedures.

28.     Significantly, Vista developed its Quality Manual with input from DCMA: DCMA's Quality Assurance Representative ("QAR") accepted Vista's Quality Manual after several in-person visits when the QAR identified, and Vista incorporated, the requisite revisions and updates to the policy.  In March 2016, Vista submitted a final "Revision C" of its Quality Manual that incorporated all of the changes DLA's QAR requested in-person and by e-mail up until that time.   DLA's QAR offered no further comments to be made to Revision C, and thus appeared to have accepted Vista's QAR.  Vista uses and follows this QMS in performing all POs.  Numerous QARs accepted this quality manner in the inspection of hundreds of source inspected items.

29.     From March 2016 and until December 5, 2016, Defendants offered no further revisions or criticisms of the Quality Manual Vista had developed and ultimately adopted in conjunction with DLA and that DLA had approved.  In addition, over the course of numerous origin inspections during that nine-month period, various DLA and DCMA representatives

visited Vista's shop and approved hundreds of Vista's parts without comment about or even
reference to the quality of its QMS or Quality Manual.[6]

30.     Vista's existing written Quality Manual is designed to achieve a high level of
quality assurance.  The Manual "provides an overview of the quality policies and key
requirements for the company" and "is the source of reference for all matters dealing with
quality."  It places all QMS documents and records on Vista's computer system and explains in
detail what quality control measures Vista must take in connection with its "core processes":
calibration, platings/coatings, heat treating, magnetic particle inspection, anodizing, and testing.
It also explains those measures Vista must take at different phases of performance to ensure no
quality breakdowns occur during crucial phases of product realization: planning, customer
relations, design and development, purchasing, control and validation of production processes,
and measurement, analysis and improvement. The Quality Manual also requires Vista to
document its quality methods and to train its employees on which procedures to apply, how to
access them, how to apply them, and how to report results. It requires Vista to train its employees
on their QMS obligations and requires annual self-audits to ensure compliance with the QMS.

31.     In filling orders, Vista/Hyde follow a thorough documentation procedure that
includes, but is not limited to, a dedicated folder for every PO Vista is awarded, including copies
of the PO, applicable QMS documents from Appendix A-1 of its QMS Master Documents List
(e.g., job traveler reports, incident non-conformance reports, and dimensional reports).  Vista
also maintains several other types of operational and quality assurance documents in its central

---

[6] An origin inspection occurs when a DLA QAR visits the contractor's site to inspect products
before they ship.  In such instances, a product must pass a rigorous, multi-faceted inspection
process certifying that the part meets the government's quality standards or the QAR will not
allow the contractor to ship the product.

files, including, but not limited to, correspondence logs, employee and vendor training records, and equipment and process calibration and measurement records.

32.     Vista holds its vendors to the same standards as Vista requires of itself.  A review of the documentation Vista included in its December 19, 2016 and August 18, 2017 PMIOs provided examples of these strict quality controls on its vendors.  Vista rejects parts that fail to meet the Government's drawings, specifications, and quality standards.

33.     Prior to August 31, 2015, DLA consistently praised and rewarded Vista for its high-quality performance, the quality of its supplied products, and the efficacy of its quality assurance program.  <u>In 2014, DCMA indicated its trust in Vista by placing Vista on its Top 500 Suppliers List.  Over the years, *several* DCMA QARs have qualified Vista for DCMA's Alternative Release Procedures ("ARP"), a highly selective status that allows contractors who have demonstrated the capability to maintain a satisfactory quality management system to release shipments before obtaining a QAR's signature in the Wide Area Workflow ("WAWF").</u>  Now DLA uses confusing, piecemeal, and vague criticisms to allege Vista has quality problems.  This directly flies in the face of DLA's own detailed and documented history in evaluating Vista.

### B.     Breakdown in the DLA Relationship

34.     In July 2015, Vista's then assigned QAR retired from Government service and DLA replaced the QAR on August 31, 2015.  As the result of some backlog from the 1.5 months without a QAR, Vista provided the new QAR with 23 orders for origin inspection.  As DLA is aware, an origin inspection occurs where the QAR travels to Vista's manufacturing facility and inspects the parts prior to shipment.  In an origin inspection, the QAR will not allow the parts to ship unless DLA (through the QAR) accepts and approves the part in the order.  The new QAR rejected 21 of the 23 orders.  Concerned over this 91% rejection rate (in contrast with Vista's

14

94% historical <u>acceptance</u> rate), Vista sought reconsideration at DCMA Dallas's top level,
several levels above the new QAR.  Subsequently, the head of DCMA Dallas sent out a team of
inspectors specializing in the parts at issue and re-inspected and <u>approved</u> all 21 purchase orders
that the new QAR had previously rejected.

35.     Soon after the August 31 Order, the QAR appeared at Vista for the next origin
inspection and told Mr. Hyde that Vista had gotten the inspector "in trouble."  The inspector then
began a nine month campaign rejecting Vista parts until being replaced by DLA in May 2016.

36.     After DLA replaced the QAR whom Vista had supposedly got "in trouble," Vista
received only one QAR rejection out of 186 orders (a rejection rate of just 0.53%) before DLA
first sought debarment proceedings on October 7, 2016.

**C.     The DCIS Investigation of Vista and Hyde**

37.     Upon information and belief, during the same period wherein DLA's QAR was
issuing repeated quality-based rejections and scrutinizing Vista's QMS, the Defense Criminal
Investigative Service ("DCIS") began to investigate Vista and Hyde.

38.     Upon information and belief, DCIS was investigating Vista and Hyde for alleged
offenses that overlap with Defendants' proposed debarment.  More specifically, upon
information and belief, DCIS was investigating allegations that (a) Vista had manufactured poor-
quality or non-quality parts for DLA and falsely certified their compliance with the
Government's requirements and applicable manufacturing regulations; (b) Vista was not the
actual manufacturer of the parts it supplied DLA; and (c) Vista did not otherwise qualify as a
contractor eligible to bid on and perform the RFQs and POs it had supplied DLA over the years.

39.     As part of its investigation, on April 1, 2015, DCIS took possession and control of
the majority of Vista's records, including, but not limited to: (a) Vista's individual job folders for

15

7,452 orders, (b) Vista's QMS training documentation; and (c) Vista's equipment and measuring

device calibration records.  DCIS later agreed to allow Vista to access and make copies of certain

files, however, several files that were material to the proposed grounds for debarment are

unaccounted for and unavailable to Vista.  As Vista/Hyde made clear in their PMIOs to the NPD,

the missing files are necessary to completely and meaningfully rebut DLA's otherwise unproven

allegations if those POs are relied on by the Government in support of its debarment actions.

    40.    DCIS's raid removed these records and immediately paralyzed Vista's ability to

deliver on pending orders and work in progress.

**D.    DLA's Corrective Action Requests ("CAR") and Vista/Hyde's CAR Responses**

    41.    Pursuant to the Defense Logistics Agency Acquisition Directive ("DLAD") Rev.

5, DLA issues Corrective Action Requests ("CAR") to address perceived quality deficiencies

and similar performance issues.  DLA issues four levels of CAR – I, II, III, and IV.  In issuing a

CAR, DLA requests that the contractor respond with a corrective action plan (CAP).

    42.    During the same period wherein DLA's QAR was issuing repeated quality-based

rejections and scrutinizing Vista's QMS, DLA issued multiple CARs purporting to address "non-

compliances" in Vista's performance under various DLA Orders.  These CARs focused on

Vista's quality system which has shipped 7,452 orders with a less than 0.5% rejection rate.

    43.    Vista thoroughly responded to DLA's CARs and provided the requested CAPs.

E-mails from DLA QAR and contracting staff prove that DLA found Vista's CAR responses

acceptable.[7]

    44.    The last CAR issued before DLA's NPDs was dated April 25, 2016.  The April 25

CAR identified three alleged non-compliances: (1) failure to meet quality standards and deliver

---

[7] Exhibit 6, August 17, 2018 PMIO at 9.

timely on "several DX rated orders"; (2) failure to provide evidence of compliance with FAR

25.246-11 Higher-Level Contract Quality System Requirements in accordance with DLA

Tailored ISO standards for several contracts; and (3) failure to address deficiencies noted in

preceding Level II CARs.

45.     Vista and DCMA communicated extensively following the April 25 CAR.  On

June 23, 2016, through its counsel, Vista issued a detailed, six page response (with 10 exhibits)

responding  to each of the agency's asserted non-compliances.   Among other things, Vista

explained:

a.   The majority of identified deficiencies identified in the April 25,
     2016 Level III CAR were not specifically tied to a physical non-
     conformity but rather alleged that Vista lacked a quality
     management program meeting the requirements of a Tailored ISO
     9001:2008 quality management program.  Vista correctly reminded
     the agency that DLA's QAR had  approved Vista's QMS.  As
     such, there was no basis for any alleged "non-compliance" with
     regard to the QMS.

b.   With regard to three DX-rated contracts, DLA's alleged quality
     rejections were undermined by the admissions of DLA's own
     inspectors.  Specifically, DLA irrationally denied Vista a deviation
     to produce a material out of B-10 Beryllium Copper instead of B-8
     Beryllium Copper (an obsolete material) without performing any
     technical analysis even after DLA's own materials engineer agreed
     that the substitution was appropriate.  And, DLA inexplicably
     cancelled an order after it delayed in issuing an agreed-upon
     modification changing the inspection location for the ordered parts
     until after the delivery date.

c.   Finally, with regard to the prior 14 Level II Cars, Vista noted its
     timely and thorough response to each such CAR and DLA's
     acceptance of those responses, as corroborated by e-mail
     communications from DLA representatives.

46.     Vista and the Agency continued to correspond regarding the nature and scope of

Vista's corrective action and the status of the April 25 CAR.  On September 23, 2016, Vista

issued another letter to DLA's Administrative Contracting Officer ("ACO") updating its response to the April 25, 2016 CAR and offering additional proposed corrective action.

47.     DLA never responded to Vista's September 26 letter and never closed out the April 25 CAR until December 20, 2016 -  the day after Vista's deadline to respond to the Notice of Proposed Debarment.

48.     In a December 20, 2016 letter (the "CAP Response Letter"), a DCMA representative claims that Vista's CAP response to the April 25, 2016 is inadequate.

49.     DLA's belated December 20, 2016 CAP Response Letter appears to have formed one of two principal bases for the Debarment Decision.  However, the SDO never made the letter part of the administrative record, nor did it provide Vista an opportunity to respond.  Indeed, DLA did not even provide the letter to Vista until the day *after* Vista and Hyde submitted its PMIO.  Accordingly, DLA denied Vista and Mr. Hyde any opportunity to respond.

   **E.     DLA's First Failed Debarment Proceeding.**

      **i.  DLA's October 7, 2016 Notices of Proposed Debarment**

50.     On October 7, 2016, the SDO issued Notices of Proposed Debarment ("2016 NPDs") proposing Vista  and Mr. Hyde for debarment and suspending it from performing any new Government contracts pending the outcome of the debarment proceeding.

51.     In the sparsely written 2016 NPDs and accompanying Memoranda in Support, DLA sketched out a handful of skeletal allegations against Vista and Mr. Hyde in support of the proposed debarment:

> a.  That during the period November 2016 through April 2016, DCMA inspectors issued detailed corrective action requests ("CAR") on 14 occasions;
>
> b.  That Vista displayed an inability or unwillingness to rectify the deficiencies;

    c.  From October 1, 2015, Government quality inspectors reported nonconforming parts and material delivered by Vista on 102 occasions;

    d.  That On April 25, 2016, DCMA issued a CAR based on "Vista's broad and consistent failure to comply with standard inspection requirements enumerated in . . . FAR 46.202-3"; and

    e.  That on applicable purchase orders, Vista has also consistently failed to meet the higher level contract quality requirements of FAR 46.204.

52.    In addition, the 2016 NPDs attached a July 22, 2016 DCMA Memorandum with the Subject: DFARS 209.406-3 Report and Recommendation for Debarment ("DCMA Report"). In the DCMA Report, a DCMA representative alleges:

    a.  That "DLA has filed over 500 Product Quality Deficiency Reports" regarding [Vista];

    b.  That Vista did not timely respond to the April 25 Level III CAR; and

    c.  That "on the basis of the above "pertinent evidence," Vista does not (i) have a satisfactory performance record; (ii) have a satisfactory record of integrity and business ethic; (iii) have the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them; and (v) have the necessary production, construction, and technical equipment and facilities, or the ability to obtain them.

53.    The 2016 NPD issued to Mr. Hyde stated that his proposed debarment was based on his affiliation with Vista and that the conduct alleged in Vista's NPD should be imputed to Mr. Hyde.

54.    On November 22, 2016, the SDO issued supplemental 2016 NPDs with supporting memoranda ("Supplemental 2016 NPDs"). The Supplemental 2016 NPDs alleged DLA's discovery of an additional 35 Vista-supplied products that allegedly failed to meet DLA's

contract requirements, and alleging that Vista and Mr. Hyde had circumvented the terms of their initial NPDs by agreeing to ship. These actions were clearly permissible, notwithstanding the NPDs.

55.     The 2016 NPDs and Supplemental 2016 NPDs also transmitted a jumbled administrative record consisting largely of copies of CARs, printouts of approximately 40 Product Rejection Report Summaries (PDREP) without PO number identifications, and approximately five of the actual rejection reports (the "2016 Administrative Record").  The 2016 Administrative Record was incomplete and incomprehensible.  The PDREPs provided summaries of rejection reports but not the actual rejection reports.  The PDREPs failed to connect alleged deficiencies to any PO Numbers and failed to adequately describe deficiencies.  For example, they made vague references to products falling short of numbered "Characteristics", or "Chars", but failed to label or describe what a "char" is, or even explain how a given product had "failed" a given "char."  Finally, the 2016 Administrative Record provided no reference or supporting documentation whatsoever for the 102 of 500 PDREPs alleged in the 2016 NPDs and Supplemental NPDs.

### ii.  DLA's Inability and Failure to Develop the Administrative Record in the First Debarment Proceeding.

56.     Prior to submitting its PMIO to the 2016 NPDs, Vista/Hyde attempted on several occasions to obtain and supplement the administrative record with information necessary to prepare a complete and meaningful response.

57.     On December 2, 2016, Vista/Hyde's counsel wrote DLA to request that the agency supplement the record with missing documents that DLA referenced in the NPDs and the administrative record but never in fact produced.  Specifically, Vista and Mr. Hyde requested (1) Vista's job folders that remained in DCIS' possession since the April 1, 2016 seizure; (2) The

complete rejection reports for 38 Vista orders that DLA claimed had been rejected; and (3) Rejection reports for all PDREPs listed in the administrative record.  Vista and Mr. Hyde explained that without Vista's folders or complete rejection reports, Vista would be unable to completely and meaningfully respond to all of the alleged rejections listed as a basis for debarment.[8]

58.    DLA replied that DLA would attempt to locate documents responsive to Vista/Hyde's requests but requested a response based on the record available on or before December 19, 2016.

59.    On December 6, 2016, DLA provided rejection reports for 35 rejections identified in the supplemental NPD, however, DLA did not provide any rejection reports for any other PDREPs.  DLA also attached a new spreadsheet listing even more alleged PDREPs missing references to PO Numbers and missing rejection reports.  Addressing the Vista files in DCIS' possession, DLA advised Vista that DCIS searched the files in its possession and no such files could be found.

60.    Vista/Hyde's counsel advised that Vista/Hyde's PMIO would address the information in the administrative record along with areas where documentation or information appears absent or unavailable.

      **iii.  Vista/Hyde's December 19, 2016 Presentation of Matters in Opposition in the First Debarment Proceeding.**

---

[8] For example, counsel noted, the PDREP summaries describe alleged rejections in terms of failure to meet "Chars," referring to specific characteristics of parts.  Beyond this inspectors' parlance, the PDREPs did not reveal the nature of the alleged deficiencies to Vista.

61.     On December 19, 2016, Vista/Hyde submitted their combined PMIO to DLA's 2016 NPDs and Supplemental NPDs.[9]

62.     The 27 page, single-spaced PMIO and its 25 exhibits affirmatively responded to every one of DLA's alleged basis for debarment.  In broad summary, the PMIO:

    a.  Introduced Mr. Hyde and Vista and their respective backgrounds;

    b.  Described, with documentary support, Mr. Hyde/Vista's outstanding past performance of performing 7,452 purchase orders with a rejection rate of less than 0.5%;

    c.  Described in detail, with documentary support, Vista's manufacturing and quality control policies and procedures;

    d.  Described, with documentary support, the events leading up to the NPD;

    e.  Explained in detail, and with documentary support, that Vista/Hyde's actions demonstrate present responsibility to the agency in accordance with FAR 9.406-2;

    f.  Explained how, among those remedial actions, Vista had engaged a third party expert, Debarment Solutions, Inc., to audit and recommend improvements to Vista's QMS to reduce the risk of quality control-related deficiencies to the lowest achievable levels;

    g.  Explained in detail, and with documentary support, how Vista's remedial actions mitigated any alleged non-responsibility in accordance with FAR 9.406-1(a)(6), (7), (8) and (9) and other mitigating factors not expressly listed in the FAR;

    h.  Provided a detailed factual rebuttal to DLA's claim that Vista failed to respond to the April 25, 2016 CAR, and  product rejections;

    i.  Provided a detailed factual rebuttal to DLA's claims of "systematic quality control issues,"  and alleged product quality deficiencies;

    j.  Provided a detailed factual rebuttal to a claim in the DCMA report that Vista lacks manufacturing capabilities;  and

---

[9] Vista's attached its 2016 PMIO as Exhibit 5 to Exhibit 6, August 2017 PMIO.  As such, the 2016 PMIO will become part of the administrative record in this action.

     k.   Provided a legal rebuttal to DLA's incorrect claim that Vista's
         decision to sign a modification reinstating an order that pre-dated
         the NPDs could serve as an independent ground for debarment.[10]

63.     Plaintiffs dedicated more than one-third of their PMIO to addressing DLA's

alleged quality control issues and alleged product deficiencies (PMIO pp. 10-20).  Noting DLA's

moving target in claiming 102, 500, 35, and similar poorly captured groups of alleged

deficiencies, Plaintiffs, in an effort to bring order and specificity to a confusing and vague

record, created a spreadsheet identifying every alleged quality deficiency it could glean from the

administrative record and provided one of four responses:

     a.   DISAGREE: Based upon the contents of the rejection report and
         Vista's review of its own files, Vista submits that the QAR or
         DCMA committed error.

     b.   ACKNOWLEDGED: Based upon the contents of the rejection
         report and Vista's review of its own files, Vista submits that Vista
         committed a quality control error, which Vista intends to rectify
         and prevent future recurrence through the remedial actions
         described in the PMIO.

     c.   UNKNOWN: Vista is unable to respond to the alleged rejection
         because DLA failed to include complete rejection reports in the
         administrative record or (ii) DCIS was unable to locate the relevant
         Vista files DCIS agents had seized on April 1, 2015.[11]

64.     Plaintiffs' PMIO also explained that the majority of the alleged deficiencies

DCMA cited as examples of quality control failures were "origin-inspected" and approved by

DLA, meaning that a DLA QAR physically inspected and approved those parts to ship to DLA's

customers before they were shipped from Vista's shop.  Stated differently, DLA was alleging

---

[10] 2016 PMIO.

[11] *Id.* at 10-20.  A fourth category, "DUPLICATIVE" indicates parts that it appears DLA counted
more than once, which had the effect of artificially increasing the number of alleged deficiencies.

deficiencies in orders its quality assurance specialists had already physically inspected and approved.

65.    Plaintiffs' PMIO explained that, in years of origin inspections, where DLA and DCMA personnel had unrestricted access to Vista's entire manufacturing facilities, processes, and documents, no DLA QAR or DCMA representative had ever accused Vista of (a) not being the actual manufacturer of the parts it supplied DLA; (b) systematic quality control failures; (c) systematic contract performance failures; or (d) any other misconduct that would have tended to show that Vista and Mr. Hyde lacked present responsibility.  To the contrary, the QARs routinely accepted and signed Vista's origin inspections and cleared Vista to ship to DLA, all while Vista's volume of business with the Government steadily grew, indicating DLA's satisfaction with Vista's performance as a manufacturer.

66.    Plaintiffs' PMIO also rebutted, in detail, the NPD's claims that Vista unilaterally cancelled eight purchase orders.  The documentary evidence failed to establish that Vista cancelled any PO.[12]

Plaintiffs PMIO explained in substantial detail several remedial actions Plaintiff has taken to mitigate the need for debarment, including, but not limited to:

- Their engagement of Debarment Solutions, Inc., an industry leading quality consulting firm, to independently assess Plaintiffs' QMS and recommend enhancements to further minimize the risk of quality issues;

- Their commitment to update all aspects of their compliance program, including: a written code of ethics and business conduct; updates to corporate documents, such as the employee handbook to codify Vista's long standing and deep running high standards;

- Their commitment to require management and employees undertake enhanced ethics and compliance training; and

---

[12] *Id.* at 14-16.

- Their understanding of the seriousness of DLA's alleged concerns and willingness to cooperate with DLA to take other actions DLA would deem necessary to ensure present responsibility.[13]

67.     Plaintiffs' PMIO also rebutted DCMA's allegations that Vista is not a manufacturer of the products it supplies to DLA, describing in painstaking detail the manufacturing process Vista undertakes to produce such parts.[14]

68.     Plaintiffs' 2016 PMIO successfully explained and demonstrated that the 2016 NPDs and the 2017 Administrative Record failed to support any alleged cause for debarment.

69.     Plaintiffs in the 2016 PMIO requested a meeting with the SDO "to discuss the evidence in the administrative record, this submission, and a path forward."[15]  Mr. Hyde and Vista stated their hope "to cooperate with DLA to resolve this matter in a manner that avoids continued suspension and debarment and allows them to continue their business while assuring DLA that they are presently responsible."[16]

70.     DLA never met with Plaintiffs to discuss the 2016 PMIO.

71.     DLA never held a fact-finding hearing required by law and regulations on any of the several issues Vista/Hyde disputed in the 2016 PMIO.

### iv.   The January 2017 Debarment Notices.

72.     On January 9, 2017, DLA issued the January 2017 Debarment Decisions, attached to this Complaint as Exhibits 3a and 3b and stating, in pertinent part:

> After careful consideration of all of the information in your presentation and the administrative record as supplemented by the DCMA documents, I have made the following determinations: a preponderance of the evidence establishes the existence of a cause for debarment; the company has failed to demonstrate its present

---

[13] *Id.* at 6-8.
[14] *Id.* at 20-25.
[15] Exhibit 6, August 2017 PMIO at 27.
[16] *Id.*

responsibility; and debarment is in the public interest and necessary to protect the Government's business interest. Vista Machining failed to deliver conforming products on multiple occasions. And, Vista Machining does not presently have an adequate means of assuring the quality of its products meet Government requirements.[17]

73.     The January 2017 Debarment Notices never discussed Vista/Hyde's PMIO other than to note that the SDO "received and considered your presentation of matters in opposition" and that "DCMA Dallas does not agree with this view and enclose documents offered by DCMA Dallas on this point."[18]

74.     DLA provided only two documents in support of the January 2017 Debarments – neither of which were part of Vista's administrative record:

    a.     First, a December 5, 2016 letter[19] entitled: "ISO 9001:2008 Audit at Vista Machining Company" ("QMS Letter").  This eight-page QMS Letter appeared to be an unsworn recording of the contents of an interview between the QAR and Mr. Hyde regarding Vista's QMS.  The QMS letter made unreliable findings concerning Vista's QMS system, purported statements Mr. Hyde made (that he did not make) and documents Mr. Hyde purportedly failed to show the QAR. The QAR who prepared and issued the letter had been to Vista's site numerous times for origin inspections and had approved dozens of products Vista had manufactured within days before and after issuing the QMS Letter.

    b.     Second, a December 20, 2016 letter – again, just one day after Vista's PMIO was due – claiming that Vista's previous CAP responses to DLA's Level III CARs were inadequate.  Like the QMS letter, this CAP response letter made incomplete and unreliable findings regarding Vista's compliant responses to DLA's Level III CARs.

75.     Both the QMS letter and the CAP Response Letter were delivered to Vista on December 20 – the day after Vista submitted its 2016 PMIO to the 2016 NPDs.  Neither letter

---

[17] *Id.*

[18] *Id.*

[19] Vista received the letter on December 20, 2016 – the day <u>after</u> it submitted its December 2016 PMIO.

was ever included in the administrative record in the 2016 debarment proceeding.  DLA never

informed Vista or Mr. Hyde it was considering the information in those documents.

Additionally, DLA never provided Vista or Mr. Hyde any opportunity to respond to the

documents.

76.     The January 2017 Debarment Notices provided no authority, justification, or even

explanation for DLA's decision not to meet with Vista and Mr. Hyde or conduct a fact finding

hearing based on the factual disputes raised by the PMIO.

**F.     Vista's First Suit in Federal Court ("Vista I") and Remand to DLA.**

77.     On January 18, 2017, Vista and Hyde filed its Vista I action against DLA in the

United States District Court for the Eastern District of Virginia, *Vista Machining Company, LLC,*

*et al. v. Defense Logistics Agency*, Civil Action No. 1:17-cv-00067 (E.D. Va. 2017).  See Exhibit

4.

78.     In Vista I, Hyde and Vista alleged that  DLA violated the APA and federal laws

and regulations governing debarment when it (among other things): (1) carelessly and

haphazardly assembled an incomplete and incomprehensible administrative record; (2) based its

January 2017 Debarment Notices exclusively on two documents never included in the

administrative record; (3) failed to issue a reasoned decision or any findings of fact; and (4)

failed to afford Plaintiffs a factual hearing and other required procedural due process.

79.     Before answering Plaintiff's Vista I Complaint, Defendants sought voluntary

remand. Vista and Hyde objected to DLA's remand request out of concern that DLA would

simply attempt to "paper over" its past mistakes and debar Vista and Hyde without a rational

basis and without providing the requisite due process.  Over Plaintiffs' objection, on May 3,

2017, the United States District Court for the Eastern District of Virginia permitted that the case

be remanded to DLA "so that Defendants can reconsider the prior decision to debar Plaintiffs from government contract work." See Exhibit 5 at p. 3.

### G.    The 2017 Remanded Proceedings.

80.    Pursuant to the Remand Order, on May 10, 2017 DLA rescinded the January 2017 Debarments.  On May 11, 2017, DLA issued new notices of proposed debarment ("2017 NPDs")[20] and another administrative record ("2017 Administrative Record").

#### i.   The 2017 NPDs and 2017 Administrative Record.

81.    The 2017 NPDs alleged five causes for debarment: (1) Deficient Quality Control System; (2) Nonconforming Items; (3) Cancelled Purchase Orders; (4) Failure to Apply Quality Control; and (5) Violations of Federal Law.  The 2017 Administrative Record consisted of a DVD containing five folders, one folder corresponding to each of the five categories.  Within those folders were copies of the December 20 letters DLA has improperly used as a basis for debarring Vista/Hyde in January 2017 as well as copies of purchase orders for certain parts referenced for allegedly defective parts.

82.    The 2017 Administrative Record had no index and, other than the folder structure and PO numbers, provided no way of tying the contents of the folders to the 2017 NPDs and Memorandum.  Neither the 2017 NPDs nor the memorandum contained document or page references to the administrative record.  Vista objected to the Agency's incomplete and confusing 2017 Administrative Record in its August 18, 2017 presentation of matters in opposition.[21]

#### ii.  Vista's August 2017 PMIO.

---

[20] Exhibits 2a and 2b.
[21] Exhibit 6.

83.    On August 18, 2017, Vista submitted its second PMIO. Like its predecessor, the

August 2017 PMIO Consistent with yet another request for a factual hearing, Vista addressed

and disputed every single allegation in the Agency's memorandum in support of proposed

debarment.  Specifically (but without limitation), Vista/Hyde:

   a.  challenged the accuracy of the DLA's testing data;

   b.  requested exhibits to be tested by an independent third party expert;

   c.  provided evidence that Vista prepared its quality manual with DCMA's oversight;

   d.  provided evidence refuting DLA's claim that Vista failed to exercise quality
       control over its supplier, Ultra Industries, Inc. ("Ultra"):

   e.  challenged the credibility of two declarations DLA had obtained from Ultra's
       Owner, Joe Lemmerman; and

   f.  provided a detailed factual discussion demonstrating that it was a manufacturer of
       the parts it supplied DLA, including certain parts alleged to have been supplied in
       violation of the Buy American Act.

84.    Additionally, Vista and Hyde explained that their PMIO raised genuine issues of

material fact and specifically requested a fact-finding hearing on each of the issues addressed:

> Vista and Mr. Hyde have disputed nearly every factual allegation
> in DLA's Memorandum.  Accordingly, they are entitled to, and
> hereby request, an evidentiary hearing and written findings of fact
> to determine (a) whether DLA has demonstrated any cause for
> debarment; (b) whether Vista and Mr. Hyde are presently
> responsible; and (c) the SDO's findings of fact in connection with
> each factual dispute raised in this submission.[22]

85.    Vista and Hyde also raised several mitigating factors counselling against

debarment.[23]

### iii.    DLA's November 8, 2017 Meeting.

---

[22] Exhibit 6 at 40.
[23] *Id.* at 35-39.

86.     Approximately two months after it received Vista's August 2018 PMIO, DLA

contacted Vista through counsel to advise that DLA wished meet with Vista/Hyde.  DLA's

counsel expressly advised that the meeting would not be a fact-finding hearing:

> Note that this will not be a fact-finding hearing as contemplated in
> FAR 9.406-3(b)(2).  Shortly after the November 8th meeting ends,
> the DLA Special Assistant for Contracting Integrity will determine
> whether there is a genuine dispute over material facts material to
> the proposed debarment, and, accordingly, whether a fact-finding
> hearing will substantively occur.[24]

87.     Defendant Perritano presided over the November 8 meeting.  This meeting was

the first time Plaintiffs were notified that Ms. Perritano had been appointed special master and

that Mr. Coyne, the Suspending and Debarring official that had issued the previous debarment

decision was no longer handling the proceeding.  Lasting approximately one hour, this meeting

addressed very few of the factual disputes Vista/Hyde raised in its PMIO.  Likewise, no

determination as to the presence or absence of factual issues surfaced during the meeting or

"shortly" thereafter as DLA's e-mail had contemplated.  In the seven months that followed, DLA

never held any fact-finding hearing and issued no correspondence regarding any of the factual

issues Vista/Hyde raised in their PMIO.

**H.     The 2018 Debarment Memorandum.**

88.     On May 1, 2018, DLA and Perritano issued the 2018 Debarment Memorandum

debarring Vista and Hyde for five years ending on October 7, 2021.  The Memorandum cite five

causes for debarment: (1) Deficient Quality Control System; (2) Nonconforming Items; (3)

Cancelled Purchase Orders; (4) Failure to Apply Quality Control; and (5) Violations of Federal

---

[24] October 5, 2017 e-mail from DLA counsel to Vista/Hyde's counsel.

law.  DLA and Perritano further determined that Vista should be debarred for five years as
opposed to the three-year period contemplated in FAR 9.406-4(a)(1).

89.    DLA admits in its Memorandum that it never held a factual hearing and never
issued factual findings concerning several disputed issues of fact set forth in Vista's PMIO:

> Respondents also requested an evidentiary hearing and written
> findings of facts relevant to this ground.  As described below,
> because Respondent's MIO and in-person meeting did not raise a
> genuine dispute over facts material to the proposed debarment, no
> such fact-finding occurred in this matter.[25]

90.    DLA further claims that "for every instance for which Respondent's allege a fact
to be disputed the undersigned found the actual fact to be undisputed and clear in the
administrative record."[26]  This claim ignores the administrative record which includes numerous
disputed facts.

91.     Throughout the 2018 Debarment Memorandum DLA dismisses Vista/Hyde's
assertions as raising immaterial issues or non-issues altogether.  For example, the August 2017
PMIO challenged the accuracy of DCMA's Product Testing Center's ("PTC") dimensional and
materials test results for several allegedly deficient parts.  Vista/Hyde's August 2017 PMIO
requested exhibits of the parts so Vista/Hyde could independently test the parts.  DLA's 2018
Memorandum ignores these claims, electing instead to accept the PTC's findings without
question, on the stated basis that the PTC "uses modern, state-of-the-art equipment and includes
an Electronics Testing Facility, a Mechanical Testing Facility, and an Analytical/Chemical
Testing Facility[.]"[27]  Likewise, DLA's "findings" make repeated references to the PTC's "clear"
findings while characterizing Vista's challenges to those findings as "simply express[ing]

---

[25] Exhibit 1 at 2 (internal marks omitted).
[26] *Id.*
[27] Exhibit 1 at 12.

displeasure" with the PTC's results. By characterizing Vista/Hyde's disputes of fact as "expressions of displeasure", DLA attempted to avoid holding a factual hearing and issuing written findings of fact as required by law. Meantime, the PTC's testing results forming a basis for debarment remain untested and unverified.

92.     DLA's 2018 Memorandum likewise avoids a factual hearing on several other disputed factual issues by drawing what it describes as "reasonable inferences" that unsurprisingly work in favor of DLA and against Vista/Hyde.   For example, the 2018 Memorandum claims DLA "determined" that Vista lacks an adequate QMS because Vista never provided the final e-mail from DCMA approving the QMS Manual. It is reasonable to infer, DLA argues, that DLA's failure to respond to Vista's e-mail indicates the manual was never approved.  The absence of an e-mail, however, is not proof of anything.  DLA's inference was far from reasonable.  In essence, DLA is holding Vista and Hyde to an impossible standard of proving a negative.

93.     Likewise, DLA claims that DCMA personnel never approved Vista's QMS during routine inspections despite the fact that approving QMS is part of the DCMA inspection. According to DLA, "a reasonable inference may be made that Respondents would name such individuals and set forth the dates of such approvals if this had ever occurred" and cites the absence of such a record as evidence of cause for debarment.[28]  DLA's self-serving claim that Vista lacked an effective QMS on 7,452 approved orders simply because it could not name the QAR assigned to those orders offends the notion of reasonableness.  To the extent DLA doubted Vista's claim that DCMA QARs approved Vista's QMS, it was required to hold a factual hearing to permit Vista and Mr. Hyde to testify about the QMS approval process and, if necessary, call

---

[28] *Id.* at 4.

witnesses like Twanya Brass, the QAS who worked with Vista to finalize the QMS and Cody Killion, the QAR who approved numerous Vista orders within days of issuing his inaccurate but highly critical audit Vista's QMS.  DLA never afforded Vista this opportunity.  Instead, it drew a self-serving inference.

94.     DLA's 2018 Memorandum also inexplicably disregards Vista/Hyde's direct challenges to declarations signed by Mr. Joseph Lemmerman, a DLA declarant who provided two declarations DLA relied upon in finding that Vista failed to manage quality control standards over its subcontractor Ultra Industries, Inc.  Vista/Hyde's August 2017 PMIO challenged Mr. Lemmerman's credibility and requested the opportunity to examine him in the context of a fact-finding hearing.  Rather than hold the requested hearing and issue written factual findings, DLA disregarded Vista/Hyde's challenge and accepted Mr. Lemmerman's declaration at face value.

95.     DLA's 2018 Memorandum also misapplies the Buy American Act by claiming – incorrectly – that the items Vista supplied under SPE4A4-13-V-K256 and SPE8EB-14-M-0957 failed to comply with the BAA because they do not meet BAA's "components test" (requiring that at least fifty percent of the product manufactured in the United States be sourced in the United States or qualifying countries).  As Vista's August 2017 PMIO explained, the components test does not apply to COTS items as clearly articulated in plain language in the BAA. DLA's failure to correctly apply the BAA precludes it from debarring Vista or Hyde on the BAA grounds.

96.     The 2018 Memorandum also attached the following six documents DLA had never before produced, and to which Vista never had the opportunity to respond:

Attachment 1. Specification Sheet for Pipe Flanges

Attachment 2. Specification Sheet for Valve Insert Wager Disks

Attachment 3. Proof of [Hyde]'s Earlier Debarment

Attachment 4. Criminal Docket Sheet from U.S. v. Ross Hyde, 92-CR-229 (N.D. Texas)

Attachment 5. Letter Withdrawing Alternate Release Procedure (ARP) Authority

Attachment 6. Email exchange between Christopher Nozicka and B. Patrick Costello, Jr.[29]

97.     Withholding these new attachments in the Administrative Record provided DLA with unchecked discretion to use the attachments in debarring Vista without ever providing Vista or Hyde an opportunity to respond as required by FAR 9.406-3 (c)(4).  Attachments 1 and 2 provide technical information that Vista and Hyde should have had an opportunity to address in their August 2017 PMIO.  Attachments 3 and 4 relate to unrelated debarment proceedings that took place nearly thirty years ago.  Had these documents been introduced into the 2017 Administrative Record, Vista and Hyde would have had an opportunity to address the thirty-year old event and demonstrate how it should have no bearing whatsoever on Vista/Hyde's <u>present responsibility</u>.  Attachment 6 contains an e-mail thread dated March 2018 – <u>seven months after</u> Vista/Hyde's August 2017 PMIO.  In Attachment 6, DLA's counsel asks DLA Logistics Operations to provide information about the JCP certification status of several companies, none of which are mentioned anywhere in the 2017 NPDs or its supporting memorandum.  Indeed, Attachment 6 demonstrates that DLA was continuing to collect facts it intended to use to support Hyde <u>seven months</u> after the August 2017 PMIO and <u>nearly one year</u> after issuing the administrative record in the 2017 debarment proceedings.

98.     Armed with its series of self-serving inferences and previously undisclosed attachments, Defendants DLA and Perritano debarred Vista and Hyde for five years:

---

[29] <u>Exhibit 1</u> attachments 1-6.

I have determined that a five-year debarment term for both
Respondents is appropriate and commensurate with the seriousness
of the causes for debarment The reasons for the period of
debarment exceeding the three-year period mentioned in FAR
9.406-4(a)(1) are discussed in great detail throughout this
memorandum, and include:

1.   Vista, which is owned and managed by Mr. Hyde, has a
     woefully deficient quality control system.

2.   Vista has an extensive history of providing non-conforming
     items to the Warfighter.

3.   Respondents actively tried to conceal their improper
     activities from various government entities and agencies.

4.   In their MIO Respondents were continuously evasive,
     misleading, and in many instances misrepresented
     incontrovertible facts contained in the administrative
     record.

5.   Mr. Hyde was previously debarred because of criminal
     misconduct in conjunction with DLA contracts.[30]

## I.   Irreparable Harm to Vista/Hyde.

99.   Mr. Hyde's and Vista's entire livelihoods depend upon their ability to fill POs

solicited by the DoD.  Without the ability to fulfill DLA POs, Vista and Mr. Hyde will be forced

to immediately shutter the business and face unemployment and financial ruin.  Indeed since

these proceedings began in 2016, Mr. Hyde and Vista have already suffered significant financial

ruin.

100.   Mr. Hyde and Vista have spent years developing the experience, training,

machinery and equipment, business relationships and human assets for the sole purpose of

manufacturing parts for DLA.  There is a substantial certainty that they will be unable to adapt

their skills to other, private industries within the three year debarment period.

---

[30] Exhibit 1 at 37-38.

## V.   CAUSES OF ACTION

### COUNT I – VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
### (All Defendants)

101.    Plaintiffs hereby incorporate all preceding paragraphs as if fully set forth herein.

102.    Defendants' 2018 Debarment Memorandum constitutes final agency action.

103.    Defendants' 2018 Debarment Memorandum violates the APA because it is arbitrary, capricious, an abuse of agency discretion, unsupported by substantial evidence, or otherwise not in accordance with law and regulation.

104.    Federal debarment regulations provide that "in actions not based upon a conviction or civil judgment, if it is found that the contractor's submission in opposition raises a genuine dispute over facts material to the proposed debarment, agencies shall . . . [a]fford the contractor an opportunity to appear with counsel, submit documentary evidence, present witnesses, and confront any person the agency presents."  48 C.F.R. §9.406-3(b)(2)(i).  In such cases, "written findings of fact shall be prepared." *Id.*

105.    Defendants' 2018 Debarment Memorandum violates 48 C.F.R. §9.406-3(b)(2)(i) because Defendants never provided Plaintiffs with a factual hearing in which Plaintiffs could test the accuracy and credibility of Defendants' factual claims, challenge the findings of the PTC, and confront Agency witnesses.  Instead, Defendants' glossed over Plaintiffs numerous factual challenges and relied upon self-selected facts and self-serving inferences to debar Plaintiffs.

106.     Federal debarment regulations require that debarment be based upon a preponderance of the evidence in an administrative record.  48 C.F.R. §9.406-2(b)(1); §9.406-3(d)(3).

107.    Defendants 2018 Debarment Memorandum violates 48 C.F.R. §9.406-2(b)(1) and §9.406-3(d)(3) because Defendants lacked a preponderance of evidence necessary to support debarment.

108.    Defendants further violated 48 C.F.R. §9.406-2(b)(1) and §9.406-3(d)(3) because they deprived Plaintiffs of a factual hearing and written findings concerning disputed issues of fact material to their debarments.

109.    Federal debarment regulations require that the debarring official "shall base the decision on the facts as found, together with any information and argument submitted by the contractor and any other information in the administrative record." 48 C.F.R. §9.406-3(d)(2)(i).

110.    Defendants violated 48 C.F.R. §9.406-3(d)(2)(i) because they based the debarment decision and the decision to exceed a three-year debarment on six attachments outside of the administrative record.  As explained above, DLA's decision to withhold these Attachments until the date of the Debarment Memorandum materially prejudiced Plaintiffs.  To this day, Plaintiffs have been given no opportunity whatsoever to respond to the six attachments.

111.    Substantial evidence demonstrates that Plaintiffs are presently responsible taking into account Plaintiff's PMIO, the substantial and ongoing remedial measures they have undertaken, and the relevant mitigation factors.

112.    Federal law prohibits a debarring official from using debarment as a punitive measure.  Substantial evidence demonstrates that Defendants issued their five-year debarment decision not to protect the Government's legitimate interests but to punish Plaintiffs for alleged past misconduct, misconduct which Plaintiffs actively dispute.  Substantial evidence likewise demonstrates that Defendants issued the NPDs and their five-year debarment decision not to protect the Government, but to retaliate against Plaintiffs, first for getting a DLA QAR "in

trouble," for pushing back when the Agency alleged a host of other unsubstantiated non-compliances initiated by that particular QAR, and for filing the Vista I Complaint that forced remanded proceedings at DLA.

113.    Defendants' unlawful debarment has caused, and will continue to cause Plaintiffs irreparable harm.

114.    For the foregoing reasons, Defendants' debarment of Plaintiffs violates the Administrative Procedure Act and entitles Plaintiffs to appropriate relief thereunder and set forth below.

WHEREFORE, Plaintiffs request that the Court vacate the 2018 Debarment Memorandum debarring Plaintiffs, enjoin Defendants from debarring or attempting to debar Plaintiffs from government contracting; and enjoin Defendants from otherwise preventing Plaintiffs from bidding upon and performing Government contracts.

## COUNT II – DECLARATORY JUDGMENT ACT
### (All Defendants)

115.    Plaintiffs hereby incorporate the preceding paragraphs as if fully set forth herein.

116.    The Declaratory Judgment Act, 28. U.S.C. §2201, empowers this Court to "declare the rights and other legal relations of any interested party" to a "case or controversy" over which the Court has subject matter jurisdiction.

117.    This action presents a "case or controversy" within this Court's subject matter jurisdiction.

118.    For the reasons set forth below, Defendants' 2018 Debarment Memorandum and debarment decision were arbitrary, capricious, lacked rational basis and violated federal law.  In attempting to debar Plaintiffs, Defendants violated the APA and Federal laws and regulations governing debarment of Federal Government contractors.

WHEREFORE, Plaintiffs request that this Court declare Defendants' 2018 Debarment Memorandum null, void, and unenforceable.

## VI.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that the Court:

a. Declare Defendants' 2018 Debarment Memorandum null, void, and unenforceable;

b. Vacate the 2018 Debarment Memorandum and Plaintiffs' debarments;

c. Vacate Defendant's decision to extend Plaintiffs' debarment from three to five years;

d. Declare that Plaintiffs are presently responsible;

e. Enjoin Defendants from enforcing the 2018 Debarment Memorandum or otherwise debarring or attempting to debar Plaintiffs from government contracting;

f. Enjoin Defendants from otherwise preventing Plaintiffs from bidding upon and performing Government contracts;

g. Order Defendants to remove Plaintiffs from the excluded contractors list and reinstate Plaintiffs as contractors in good standing and eligible to bid upon and perform Government contracts;

h. Award Plaintiffs their reasonable attorneys' fees and expenses expended in pursuing this action; and

i. Grant such further relief as this Court deems just and appropriate.

Dated: August 2, 2018                    Respectfully submitted,

                                         KILPATRICK TOWNSEND & STOCKTON LLP


                                         By:  ___/s/ Gunjan R. Talati_____
                                         Gunjan R. Talati (D.C. Bar No. 976169)
                                         907 14th Street, N.W., Suite 900
                                         Washington, DC  20005
                                         202.481.9941 (telephone)

202.379.2776 (facsimile)
GTalati@kilpatricktownsend.com